UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>AMY WINSLOW,<br>MOHAMMAD HOSSEIN MALEKNIA, and<br>REBA DAOUST,<br><br>Defendants | Criminal No. 23-10094-PBS |

GOVERNMENT'S MOTION TO PRECLUDE AND
LIMIT DEFENDANTS' PROPOSED EXPERT TESTIMONY

The defendants have disclosed that they intend to call two expert witnesses to testify at trial, Dr. William Banner, M.D., Ph.D., and Philip J. Phillips, B.S. MBA. The defendants' expert disclosures are attached hereto as Exhibits 1 and 2. Very few of the opinions the defendants intend to elicit from Dr. Banner, a physician with a background in toxicology, and Mr. Phillips, an FDA regulatory consultant, constitute proper expert testimony. For that reason, and those set forth below, the government moves to preclude and limit the defendants' proposed expert testimony.

I.  FACTUAL BACKGROUND[1]

In November 2012, Magellan sought clearance from the FDA to market its LeadCare Ultra device, which was intended for laboratory use in testing blood lead levels. Instead of seeking pre-market approval as a new device, Magellan submitted a traditional 510(k) application for LeadCare Ultra, claiming that it was substantially equivalent to the already cleared LeadCare II device, which

---

[1] These facts are based on the allegations in the indictment and are offered to provide context for the arguments below. A more fulsome factual summary is set forth in the government's opposition to the defendants' motion to compel. *See* Dkt. 102.

was used in doctors' offices for the same purpose. Each of the defendants was involved in Magellan's testing, application for FDA clearance, and sales launch of LeadCare Ultra.

In January 2013, the FDA issued a hold memo for Magellan's LeadCare Ultra 510(k) application and requested additional studies. In June 2013, while performing the FDA-requested studies, Magellan discovered a malfunction affecting the LeadCare Ultra device (the "Malfunction") that caused blood lead test values to be lower than actual values under certain conditions.[2] Defendant Reba Daoust, then the Manager and Director of Quality Assurance and Regulatory Affairs at Magellan, was one of the first employees to learn about the Malfunction. She informed defendant Amy Winslow, Magellan's President and CEO at the time, and defendant Hossein Maleknia, the company's Chief Operating Officer and Vice President of Operations, about the Malfunction the day after she received the study results, but none of the defendants ever reported the results to the FDA. Instead, Magellan reported the results of a different study, and the FDA – unaware of the Malfunction – cleared LeadCare Ultra for marketing and distribution in August 2013.

After multiple tests confirming the Malfunction, and tests indicating that the Malfunction also affected the already cleared and widely used LeadCare II device, Magellan released LeadCare Ultra for sale to customers in December 2013. Magellan did not notify potential customers or the FDA about the Malfunction prior to the release. Then, in August 2014, LeadCare Ultra customers themselves observed inaccurate and variable lead test results and notified Magellan.

In November 2014, after expressing surprise to the complaining customers about their anomalous results, Magellan sent LeadCare Ultra customers a letter about the Malfunction, which

---

[2] Specifically, lead values tended to be falsely low when blood samples were tested immediately upon mixture with treatment reagent, and would rise over time as the blood samples incubated in the reagent.

was drafted by Daoust, edited by Winslow, and approved by Maleknia. The letter contained several false and misleading statements that misrepresented the frequency of, and when Magellan first discovered, the Malfunction. The letter also advised customers to incubate the blood sample/treatment reagent mixture for 24 hours before running the test – a significant change to the instructions on LeadCare Ultra's product label, which allowed immediate testing upon mixing the blood sample and treatment reagent. The FDA later found that Magellan's own studies did not support the claim that the 24-hour incubation period sufficiently mitigated the problem.

Magellan finally notified the FDA about the Malfunction and the company's unilateral, unapproved change to LeadCare Ultra's user instructions in April 2015, after an outside consultant learned of the issue and threatened to tell the FDA if Magellan did not. The medical device report (MDR)[3] Magellan submitted to the FDA to report the Malfunction was false and misleading in several ways. First, like Magellan's customer letter, the MDR concealed the severity and prevalence of the Malfunction and when Magellan first learned of it. Second, the MDR misrepresented the reason for the late submission. Third, the MDR misrepresented the number of complaining customers. And fourth, the MDR falsely represented that 24 hours' incubation was a complete mitigation for the Malfunction.[4]

Later in 2015, Magellan scientists identified the likely root cause of the Malfunction: a substance in the rubber stopper of commonly used test tubes manufactured by Becton Dickinson interfered with the LeadCare device sensors and caused test results to be lower than expected.

---

[3] An MDR is a surveillance tool that the FDA uses to monitor device performance and detect safety issues.

[4] The FDA received hundreds of thousands of MDRs in 2015, and this MDR did not receive sufficient attention for various reasons. As a result, the FDA did not follow up with Magellan at the time.

In November 2016, approximately three years after the defendants first discovered the Malfunction in LeadCare II, and more than two years after conducting additional internal studies that confirmed the appearance of the Malfunction in both LeadCare II and LeadCare Ultra, the defendants finally notified the FDA and customers that the Malfunction also impacted LeadCare II. In doing so, however, they made false and misleading statements about when they discovered the problem in LeadCare II. Daoust authored a cover letter and MDR falsely stating that LeadCare II did not originally exhibit the issue and that it was only after Magellan identified the root cause of the problem in LeadCare Ultra that it checked to see if LeadCare II was also impacted.

In March 2017, Magellan filed a special 510(k) application to change the labels for LeadCare Ultra and a new product, LeadCare Plus, to allow customers to test the blood-reagent mixture after either 24 hours of incubation or just one hour of incubation under certain conditions. The application triggered urgent questions from the FDA about the Malfunction and its effect on the accuracy and safety of LeadCare devices. The FDA was particularly focused on when Magellan first discovered the Malfunction, because the date of discovery determined the number of patients who could have received false test results. During an April 20, 2017 conference call, an FDA official asked Magellan representatives when Magellan first discovered the Malfunction. Based on input from Daoust and Maleknia before the call, and at the direction of Daoust during the call, a Magellan consultant falsely told the FDA that Magellan had first discovered the problem in late 2014 after receiving customer complaints.

The FDA ultimately found that Magellan's own data showed that the LeadCare devices could not accurately measure lead levels in blood samples drawn from a vein, regardless of the recommended incubation time. In May 2017, the FDA recommended a recall of all LeadCare

4

devices using venous samples and warned the public not to use the devices for venous samples because of the Malfunction.

II.     DEFENDANTS' PROPOSED EXPERTS

   A.     Dr. William Banner

The defendants intend to call Dr. William Banner, a practicing physician specializing in pediatrics with a background in toxicology, to testify about (i) the health impacts of lead levels and lead level trends across the United States, (ii) CDC guidance with respect to lead levels, (iii) lead testing and treatment, and (iv) the impact of false low test results due to the Malfunction. *See* Ex. 1. Dr. Banner has previously testified as an expert witness for lead-producing industries, and has espoused the view that blood lead levels significantly higher than the thresholds set by the CDC are not dangerous.

   B.     Philip J. Phillips

The defendants also expect to call Philip Phillips, a regulatory consultant who worked for the FDA from approximately 1981 to 2005, most recently as Deputy Director of Science and Regulatory Policy for the Office of Device Evaluation (ODE). *See* Ex. 2. According to the defendants' disclosure, Mr. Phillips's testimony is to be based primarily on his experience "leading . . . the FDA unit that oversaw Magellan" and his responsibility for the development of FDA premarket guidance. *Id.* In addition to general testimony about the FDA's statutory mandate and regulatory scheme, Mr. Phillips proposes to opine on "ambiguity" and "inconsistency" in FDA regulations, guidance, and enforcement, and resulting "uncertainty" in the medical device industry. *Id.* The defendants also intend to elicit purported expert testimony from Mr. Phillips as to the operations of small medical device manufacturers "within the changing regulatory environment"

and his opinions as to the reasonableness and/or understandability of Magellan's conduct during the relevant time period – the very conduct underlying the charges in this case. *Id.*

III. APPLICABLE LAW

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, and the Court's role as a gatekeeper is prescribed in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). *See United States v. Rodriguez-Berrios*, 573 F.3d 55, 70–71 (1st Cir. 2009) (affirming exclusion of expert testimony). Expert testimony is admissible only if it is both (i) "relevant to the task at hand" and (ii) "rest[s] on a reliable basis":

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002) (quoting Fed. R. Evid. 702) (court must probe proffered expert testimony for "both reliability and relevance"). As to relevance, expert testimony "must be relevant not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, would likely assist the trier of fact to understand or determine a fact in issue." *Id.* As to reliability, the Court must evaluate not only the validity of the expert's methods, but also whether "that reasoning or methodology properly can be applied to the facts in issue." *Id.*

Even where expert testimony satisfies the relevance and reliability hurdles, it "remains subject to exclusion under Rule 403." *United States v. Pires*, 642 F.3d 1, 12 (1st Cir. 2011) (excluding defendant's expert under Rule 403). In evaluating unfair prejudice, "courts must guard against letting [expert testimony] intrude in areas that jurors, by dint of common experience, are uniquely competent to judge without the aid of experts." *Id*.

IV.    ARGUMENT

    A.    Dr. Banner's Testimony

While Dr. Banner appears generally qualified, very little of his proposed testimony constitutes proper expert testimony. Most of the opinions outlined in the defendants' expert disclosure are speculative and not the product of reliable principles and methods, and should therefore be excluded. As discussed further below, Dr. Banner should be limited to providing opinion testimony only regarding specific medical practices with which he is familiar and certain patients whose medical records he has reviewed.

*First*, while the health impacts of lead levels over/under certain thresholds is relevant to the harm caused by the Malfunction,[5] proposed testimony that average blood levels in the United States have decreased over time is not relevant to any fact in issue. Rule 702 "does not give [defendants] a right to present irrelevant evidence," and to be relevant, all evidence, including expert testimony, must make a fact more or less probable that relates to the elements of the crimes charged or cognizable defenses. *See United States v. Maxwell*, 254 F.3d 21, 24–26 (1st Cir. 2001). Not only is testimony about lead level trends irrelevant, but it is also misleading if offered to suggest that current lead levels pose little health risk. It is well-established that there is no safe level of lead in the blood. Any suggestion to the contrary lacks a scientific basis. Therefore,

---

[5] To be admissible, any opinion regarding the health impacts of blood lead levels must be not only relevant but based upon sufficient facts or data. As discussed further below, the defendants have proffered various opinions by Dr. Banner that have no such basis – for example, that symptoms of autism and other childhood developmental disorders (such as increased hand to mouth and floor-based activities) typically result in increased blood lead levels, not vice versa. But neither the defendants nor Dr. Banner provide any basis for this opinion, among others. Where there is no medical or scientific basis for Dr. Banner's proffered opinions – no study results, no data, no research – the defendants should be precluded from introducing them.

7

testimony that blood lead levels have decreased or, relatedly, that lead testing has become less important, is at best confusing and at worst misleading, and in any event, unfairly prejudicial.

*Second,* the fact that Dr. Banner served on the Advisory Committee on Childhood Lead Poisoning Prevention does not provide a valid basis for him to testify as to CDC decision-making. The defendants propose to have Dr. Banner testify about the factors underlying CDC decisions with respect to blood lead level thresholds and the basis for related CDC guidance. But Dr. Banner did not work for the CDC. While he may have worked *with* the CDC as a member of the aforementioned committee – which, in the government's understanding, he joined at the suggestion of a lead industry representative – that work does not entitle him to speak on behalf of the CDC. Even if serving on the committee provided a basis for the proposed testimony, which it does not, Dr. Banner was a committee member from 2002 to 2005, far outside the relevant time period in this case. Therefore, any testimony regarding his "understanding" as to CDC decision-making should be excluded.

*Third*, Dr. Banner should be prohibited from testifying generally about states' and medical professionals' acceptance of, and/or practices with respect to, CDC's blood lead level thresholds and associated guidance. Subject to the limits of Rules 401 and 403, Dr. Banner may be entitled to provide opinion testimony based on his own experience – that of his own medical practice and perhaps others with which he is familiar – but the defendants have offered no basis, and the government is aware of none, for his proposed testimony regarding best practices and recommended protocols of medical professionals across the United States.[6] Further, testimony

---

[6] Similarly, the defendants intend to elicit from Dr. Banner testimony regarding the use of LeadCare devices in clinical settings – *i.e.*, how labs, clinicians, and medical professionals test and use the devices, and validate the results. Here too the Court should limit Dr. Banner to testifying only about his own practices with respect to lead testing, and perhaps those of others with which he is familiar based on personal knowledge.

8

regarding current practices/protocols is irrelevant and risks juror confusion. It is undisputed that the relevant time period here is approximately 2013 to 2017, and the evidence will be that during that time, Magellan was focused on the CDC's blood lead level threshold of 5 μg/dL. Dr. Banner's proposed testimony regarding the current 3.5 mcg/dl threshold as compared to the prior 10 mcg/dl threshold would serve only to confuse the issues and should therefore be precluded.

*Fourth*, the defendants have offered a series of speculative opinions about the impact of lead suppression due to the Malfunction based on nothing more than Dr. Banner's "understanding." Dr. Banner opines that the government and its anticipated witnesses overstate the potential harm resulting from the Malfunction because any discrepancies in lead test results were not significant enough to have impacted whether a patient required intervention. He further opines that even where an inaccurately low test result did result in a lack of intervention, the treatment protocol for high blood lead levels overlaps with routine care so there would have been no meaningful difference in the recommended course of action. Put simply, the defendants intend to make a "no harm, no foul" argument through their expert. Not only is such testimony entirely at odds with Magellan's own policies, statements, and decisions, there is no reliable basis for it. Such speculative opinions, ungrounded in any identifiable principle or method, are improper. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). The defendants have reserved the right for Dr. Banner to review and testify regarding the health records of patient victims identified by the government. Such testimony may be proper, depending on its nature and scope, but general testimony about the nationwide impact of the Malfunction on any number of unidentified patients who received inaccurate lead test results is not.

In sum, the Court should preclude the defendants from eliciting testimony from Dr. Banner about decreasing lead levels, CDC decision-making, states' and medical professionals' practices with respect to CDC blood lead level thresholds and lead testing generally, and should prohibit Dr. Banner from offering speculative opinions regarding the harm caused by the Malfunction. Instead, Dr. Banner should be limited to providing opinion testimony only regarding specific medical practices with which he is familiar and certain patients whose medical records he has reviewed.

B.      Mr. Phillips's Testimony

Like Dr. Banner, Mr. Phillips appears qualified as an expert in his field. But nearly *all* of his proposed testimony is improper, primarily because it threatens to usurp the role of the jury. The defendants have disclosed three categories of testimony they intend to elicit from Mr. Phillips (in addition to a general "rebut[tal]" of any opinions offered by government witness Courtney Lias). Only the first – the FDA's statutory mandate and regulatory scheme – is potentially relevant and helpful to the jury in sorting out contested issues. *See United States v. Mehanna*, 735 F.3d 32, 67 (1st Cir. 2013) ("It is common ground that a trial court may bar expert testimony if that testimony will not assist the jury to sort out contested issues."). But as discussed below, even this proposed testimony goes too far – first, in characterizing FDA regulations, guidance, interpretation, and enforcement as ambiguous and inconsistent and, second, by opining on the resulting uncertainty "from the perspective of a medical device manufacturer." Ex. 2. The other two categories of proposed testimony – the operations of small medical device manufacturers within the regulatory environment and, in particular, Magellan's conduct in the context of that environment – are entirely improper and should be excluded in their entirety.

As an initial matter, Mr. Phillips was not at the FDA during the relevant time period. So while he may have "le[d] for over a decade, the FDA unit that oversaw Magellan['s predecessor

10

company],"  Ex. 2, he does not have personal knowledge of the facts at issue in this case. To the extent the defendants intend to elicit Mr. Phillips's testimony regarding FDA regulations and processes generally, and FDA guidance in effect during the relevant time period, the government does not object. However, their proposed testimony about the FDA's "failed efforts" between 2011 and 2017 to reform its 510(k) requirements and replace its 1997 guidance, which Mr. Phillips reportedly developed, and resulting "uncertainty in the industry during that period," Ex. 2, is improper for multiple reasons. First, because Mr. Phillips was not at the FDA between 2011 and 2017, he should not be permitted to testify as to the FDA's internal efforts at reform during that period. Second, to characterize FDA regulations and guidance as ambiguous and/or inconsistent is to provide an opinion without any legitimate basis. Third, unless the defendants were personally aware of the FDA's reform efforts and purportedly inconsistent statements, Mr. Phillips's proffered testimony is confusing and misleading.

For example, the defendants intend to elicit testimony about non-binding FDA guidance issued in October 2014 acknowledging uncertainty regarding, and inconsistent interpretation of, certain regulations. But if the defendants were unaware of this guidance, such testimony is misleading because it attributes uncertainty to them. The critical issue in this case is the defendants' knowledge and intent. Testimony about uncertainty in the industry "from the perspective of a medical device manufacturer," Ex. 2, substitutes the opinion of a proposed expert for that of the defendants themselves. The defendants of course have an unequivocal right not to testify, but they cannot put in a state-of-mind defense through their expert. Further, even if the proffered testimony regarding uncertainty in the industry were true, it would not be a cognizable defense to the charges here. *See United States v. Brandon*, 17 F.3d 409, 443–45 (1st Cir. 1994) (excluding defendant's expert testimony in bank fraud prosecution, where defendants were charged with lying about down

11

payments required for consumer loans, because expert opinion that banks typically provided no-down-payment financing on commercial loans was irrelevant); *see also United States v. Tetioukhine*, 725 F.3d 1, 7 (1st Cir. 2013) (district court properly excluded expert witness testimony, in part because it consisted of "unhelpful abstractions that failed to build the crucial bridge to the issue of [the defendant's] intent").

More problematically, the defendants intend to elicit a series of opinions from Mr. Phillips that go directly to the ultimate issue of their knowledge and intent. For example, Mr. Phillips opines that Magellan's response to the Malfunction and related customer complaints was "understandable" and "inconsistent with a company attempting to hide" an issue. Ex. 2. Taking it one step further, the defendants intend to offer Mr. Phillips's opinion that Magellan's November 2014 customer letter was not false or misleading. This is not proper expert testimony. It is up to the jury to assess the defendants' actions (and inaction) and determine the truth or falsity of Magellan's statements regarding the Malfunction. Mr. Phillips's proffered testimony therefore threatens to usurp the role of the jury. *See Pires*, 642 F.3d at 12 ("[C]ourts must guard against letting [expert testimony] intrude in areas that jurors, by dint of common experience, are uniquely competent to judge without the aid of experts."). The defendants cite no authority, and the government is aware of none, for allowing a purported expert to testify as to the ultimate issues of knowledge, intent, truth/falsity, and materiality in a fraud case. For these reasons, the proffered testimony regarding Magellan's conduct should be excluded in its entirety.[7]

---

[7] Mr. Phillips also opines that the FDA did not respond to the April 2015 MDR because it was satisfied with the details and had "little concern." Ex. 2. Mr. Phillips was not at the FDA at the time and therefore has no personal knowledge regarding the FDA's response to Magellan's eventual reporting of the Malfunction. He is not a fact witness. And there is no basis for this purely conjectural opinion. *See United States v. Wilson*, 798 F.2d 509, 517–18 (1st Cir. 1986) (affirming exclusion of defendant's expert testimony: "As the government notes, the problem with [the expert's] testimony is that there was no evidence in the record to support the central assumption

The defendants' disclosure also includes Mr. Phillips's opinions regarding the role of a hypothetical FDA regulatory consultant at a hypothetical medical device company, "the typical manner" in which small medical device companies rely on outside consultants, and the approach regulatory consultants typically take to a regulatory matter for a client. This testimony too should be excluded. The "typical" role of regulatory consultants in the medical device industry is irrelevant to the facts at issue in this case. Mr. Phillips has no personal knowledge of third-party consultants at Magellan, or their role in advising the company with respect to the Malfunction. The defendants should not be permitted to conflate and confuse the issues by eliciting purported expert testimony regarding regulatory consultants generally. The jury does not need the aid of a former FDA employee/current regulatory consultant to assess the facts surrounding the defendants' interactions with Magellan's outside consultants. Put simply, the defendants may not call a purported expert, who lacks any personal knowledge of such interactions, to proffer opinions shifting blame from the company and its executives to third-party consultants.

## CONCLUSION

For the foregoing reasons, the Court should preclude the defendants from introducing certain proposed expert testimony and otherwise limit the testimony of Dr. Banner and Mr. Phillips as set forth above.

Respectfully submitted,

JOSHUA S. LEVY
United States Attorney

By:     /s/ Leslie A. Wright
        JAMES D. HERBERT
        KELLY BEGG LAWRENCE
        LESLIE A. WRIGHT
        Assistant United States Attorneys

---

upon which it would be based. Thus, we agree with the district court that the testimony was excludable as guesswork, conjecture and speculation that would serve only to confuse the jury.").

CERTIFICATE OF SERVICE

      I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                        */s/ Leslie A. Wright*
                                        LESLIE A. WRIGHT
                                        Assistant United States Attorney

Date: December 23, 2024